**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **ROBERT LISERIO** | |
| **Plaintiff,** | |
| **vs.** | **Civil Action No. 5:19-cv-01159-XR** |
| **COLT OILFIELD SERVICES, LLC,** **ROY E. (EDDIE) AGUILAR,** **AND TERRY BOOKER** | **A jury is demanded** |
| **Defendant.** | |

**FIRST AMENDED COMPLAINT OF ROBERT LISERIO FOR BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, BREACH OF FIDUCIARY DUTIES AND DUTIES RELATED TO A SPECIAL RELATIONSHIP OF TRUST, FOR AN ACCOUNTING AND RELATED CLAIMS OF DAMAGES**

TO THE HONORABLE XAVIER RODRIGUEZ, UNITED STATES DISTRICT JUDGE:

COMES NOW Plaintiff, Robert Liserio ("Plaintiff") and files this First Amended Complaint[1] for Damages arising from Breach of Contract, Breach of Fiduciary Duty, Breach of a Special Relationship of Trust, Accounting and Related Claims, against Roy E. (Eddie) Aguilar (herein "Aguilar"), Terry Booker (herein "Booker"), and the entity over which they exercised total control, Colt Oilfield Services, LLC (herein sometimes "Colt" or "Defendant-Colt"), (herein, Aguilar, Booker, and Colt are collectively referred to as "Defendants") as follows:

**I.**
**PARTIES**

1.    Robert Liserio, Plaintiff, is an individual who is a citizen and resident of the State

---

[1]    It is intended that this First Amended Complaint comply strictly and precisely with the authority granted by this Court's Order of July 10, 2020, [Dkt #52] (the "Order"). To the extent that any language or assertion in this Amended Complaint could be read to expand any permission granted by the Order, the Plaintiff expressly states that it is not his intention and no such expansion can result from this contents of this Pleading.

of Wyoming at the time of the filing of the Plaintiff's Original Petition removed from Bexar County District Court and at the time of filing this Amended Complaint.

2.      Colt Oilfield Services, LLC is a Texas limited liability corporation with its principal place of business located in San Antonio, Texas. Colt is authorized and registered to do business in Texas. Colt has been served and has made an appearance in this case. Plaintiff claims that he was a member of Colt.

3.      Roy E. (Eddie) Aguilar is an individual who resides in San Antonio, Texas and a resident of Texas. Aguilar has been served and has made an appearance in this case.

4.      Terry Booker is an individual citizen of Texas who resides in 16683 West FM 580, Lometa, Texas 76853-3549 and has been served and has made an appearance in this case.

5.      The wrongful civil conspiracy described herein involves the conspiracy to breach the fiduciary and other duties arising from the special relationship described herein owed by Defendants Aguilar and Booker to Plaintiff, including the aiding and abetting of the breach of those duties by each of these two Defendants that caused Colt to engage and commit. Each reference herein to the civil conspiracy references these Defendants and each of their agents, employees, and parties directing the acts and conduct in concert with each other Defendant.

## II.
## JURISDICTION AND VENUE

6.      In denying Plaintiff Liserio's Motion to Remand this Court has determined that it has diversity jurisdiction over this suit and that the removal was proper The amount in controversy exceeds the jurisdictional minimum limits of this court.

7.      This court has personal jurisdiction over the removing Defendants because (i) Defendants are each a citizen of the State of Texas and all are conducting substantial and continuous business within the State of Texas, and maintain principal places of business within

the State of Texas and within Bexar County, Texas; and (ii) because all of the Defendants conduct business in this the State of Texas and Defendants have committed, or caused to be committed, a tort in whole or in part in the Western District of Texas, including fraud, breach of fiduciary duty and breach of the duties that arise from the special relationship of the parties.

8.     Venue is proper in the Western District of Texas as one or all of the Defendants reside or have their principal place of business in the Western District of Texas, or a substantial part of the fraudulent, deception, fraudulent inducement, and fraudulent omissions as plead in this case occurred in the Western District of Texas.

### III.
### FACTUAL ALLEGATIONS

9.     Plaintiff Liserio's business relationship with Defendant Terry Booker extends from 2002 to the present, during which Plaintiff and Booker operated business and common interests in oil and gas service companies.  Plaintiff's business relationship with Defendant Aguilar extends from 2009 to the present with the formation of Defendant-Colt, and from its formation in 2010 and the public notice filed that Plaintiff was a member.  This joint ownership of an equity interest in Colt continued thereafter to the time it was secretly sold to PetroStar Oilfield Services, LLC in 2018 and its business and assets disposed of by Defendants.  It is this secret and undisclosed sale that is the basis of Plaintiff's claims against the Defendants and their civil conspiracy to hide and secret the sale from Plaintiff and thereby to take for their own use the 25% net proceeds interest owned by Plaintiff in Colt and in those proceeds, and to knowingly and intentionally breach their fiduciary or special relationship duties as a means to fraudulently accomplish the secret sale and obtain possession of Plaintiff's property.

**A.**     **The Formation of Colt and Division of "Equity" Among the Parties to this Suit**

10.     In 2009 Plaintiff became acquainted with Defendant Aguilar through the owner of

Plaintiff Liserio's then-current employer, Devin Nevilles ("Nevilles"). At the time of the formation, Plaintiff Liserio had dealt with Booker for several years, and was introduced to Aguilar who had done business previously with Terry Booker, according to Aguilar.

11. Initially Aguilar and Plaintiff were named the only members and owners of Colt, leaving out two of the other owners Nevilles and Booker. Nevilles claimed that he did not want to be listed as an owner as a result of issues arising from non-competition agreements and to avoid unnecessary litigation. Mr. Booker, as explained below in detail, wanted to be a "silent partner" of Colt.

12. Importantly, Aguilar was initially a minority owner with Nevilles owning the largest share of Colt. Aguilar neither formed, nor capitalized, Colt and until 2015 did not direct its operations or claim to direct or supervise Aguilar. Aguilar, however, was named as the managing member, although Aguilar did little, if any, actual operations, all of which were managed by Nevilles and advised by Booker, and by in the field, by Plaintiff Liserio.

13. At the time of formation of Colt, Booker was the agent and field consultant for a publicly traded company known as QEP, and was in charge of selection of all QEP's field service companies such as Colt, to perform QEP contracts. Defendant Booker was to supply the business and consulting for Colt, and Liserio's functions were strictly field operations. Liserio was not permitted to propose pricing or terms of service, nor was he initially permitted to call upon QEP or other companies to solicit work. Those functions were handled, at least initially, by Booker.

14. Colt was initially formed to do "Torque and Testing" of drilling and completion operations related to the exploration and production of oil and gas, and both Nevilles and Plaintiff Liserio were intimately familiar with such business. Aguilar had not done any torque and testing business, and because of the lack of experience, was not in charge of those operations of Colt. In fact, Aguilar was not qualified to be in charge, that being left to Nevilles and Plaintiff Liserio.

Page 4

### B. The Wyoming Trip and Agreements Among All Colt Owners

15. Pre-formation Plaintiff had several lengthy discussions with both Nevilles and Booker, and to some extent Aguilar regarding the new operations of Colt, and its ownership that had been recorded in Aguilar's and Liserio's name. Plaintiff Liserio also had several conversations with Aguilar regarding the newly formed entity, ownership, and operations, all reflected at the time in certain written documents and public filings discussed below listed below.

16. Plaintiff was to be in charge of all of Colt's field operations in Wyoming, along with other work expected in Texas, Louisiana and North Dakota, which together was the principal places of Colt's proposed business field operations. However, Plaintiff's work was almost exclusive in Wyoming from inception to 2016.

17. In that process of initiating Plaintiff's familiarity with Colt's proposed business, Plaintiff Liserio and Terry Booker drove from Pinedale, Wyoming to Jackson Hole, Wyoming to view the primary place of Defendant-Colts' operations. The Colt operations were formed to service almost exclusively QEP that Booker acted as consultant for field operations and controlled awarding of all QEP third party service work. It was during that travel that Booker told Plaintiff:

     a. That Booker was a 25% owner of Colt, but his ownership was as a "silent partner" and that Plaintiff should not discuss or disclose Booker's ownership interest or his participation as a silent partner with anyone other than Aguilar;

     b. That Nevilles owned 40% of Colt as a "silent partner" and Aguilar and Liserio owned 20% and 15% respectively of Colt as the only recorded interest owners;

     c. That Booker would be certain that (i) Plaintiff would always get his fair share distribution of his 15% from Colt and (ii) that Colt would get the QEP business (both of which promises and representations were vital because absent either, the value of Colt to Plaintiff was minimal and they would never have remained in Wyoming with Colt for

nine (9) years without those promises).

        **C.**        **Plaintiff and his Family Spent Nine (9) Straight Years in Wyoming Beginning From the Start of Colt Field Operations**

18.     Plaintiff was married at this time and the agreements and promises made by Defendants and confirmed by Nevilles, as well as 9 years of subsequent performance by Plaintiff of his commitment, and performance on these promises and representations by Defendants on their promises, were the significant and only motivation to agree to undertake this position and risks inherent with this new start-up business planned by Colt. Initially, while there was no specific written agreement that Plaintiff is aware among these owners, but there were several writings and public filings that clearly evidenced the Defendants' agreements regarding ownership of Colt, including the following prepared by the Colt CPA David Ryza, who was also to serve as its CFO:



**Colt Oilfield Services, LLC**

5496 March Street
Robstown, TX 78380
361-387-7488

August 25, 2010

Robert Liserio receives a check at the end of each year for his partnership interest in Colt Oilfield Services, LLC.

Colt Oilfield Services, LLC.

*David Ryza*
David Ryza, CFO

This letter unequivocally states that Robert Liserio owned a equity partnership interest in Colt and

that it was the agreement that the distributions from Colt's operations were to be made annually and to reflect "his partnership interest in Colt…" (herein the "Distributions"). In addition to this clear statement of the "partnership" nature of the interests owned among the four, Colt issued its checks in payment of the partnership distributions, payable to Plaintiff "Robert V. Liserio" (later these "distributions" were also made to Plaintiff's wife, Lisa Liserio) accompanied with the notation on the check and check stub that the amount paid reflected the "equity" ownership of Plaintiff – a follows:

| COLT OILFIELD SERVICES, LLC | | | | | 1459 |
|---|---|---|---|---|---|
| Robert V. Liserio | | | Check Number: | 1459 | |
| | | | Check Date: | Dec 21, 2009 | |
| | | | Check Amount: | $120,000.00 | |
| Invoice | Date | Discount Taken | Amount Paid | Quantity | Description |
| 122109 | 12/21/09 | | 120000.00 | | Equity Robert Liserio |

19.     Although Defendants have denied, in writing, and before this Court, that Plaintiff owned no equity or interests in Colt, in truth, this "equity" distribution and payment reflected in the CFO's letter and in the check issued by Colt, was further the basis of Colt's public filings, reflected in the public record of the Secretary of State of Texas in the annual Franchise Report filed by Colt, naming the members as: Eddie Aguilar and Robert Liserio:

00005024223

# TEXAS FRANCHISE TAX PUBLIC INFORMATION REPORT

*To be filed by Corporations and Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

Comptroller 05-102
of Public
Accounts FORM
(9-09/29)
■ Tcode 13196

| | |
|---|---|
| ■ Taxpayer number | 3 2 0 3 8 2 2 1 9 0 2 |
| ■ Report year | 2 0 1 0 |

**You have certain rights** under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at: (512) 463-4600, or (800) 252-1381, toll free nationwide.

Taxpayer name  **Colt Oilfield Services, LLC**

Mailing address  **5496 March Street**

| City | State | ZIP Code | Plus 4 | Secretary of State file number or Comptroller file number |
|---|---|---|---|---|
| Robstown | TX | 78380 | | 0801044650 |

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office  **5496 March Street, Robstown, TX 78380**
Principal place of business  **5496 March Street, Robstown, TX 78380**

*Please sign below!*

Officer, director and member information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or members change throughout the year.

3203822190210

**SECTION A** Name, title and mailing address of each officer, director or member.

| Name | Title | Director | Term expiration | m m d d y y |
|---|---|---|---|---|
| **Eddie Aguilar** | Member, CEO | ○ YES | | |
| Mailing address **5496 March Street** | City Robstown | | State TX | ZIP code 78380 |
| **Robert Liserio** | Member | ○ YES | | |
| Mailing address **5496 March Street** | City Robstown | | State TX | ZIP code 78380 |
| **David Ryza** | CFO | ○ YES | | |
| Mailing address **5496 March Street** | City Robstown | | State TX | ZIP code 78380 |

**SECTION B** Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of ten percent (10%) or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of Ownership |
|---|---|---|---|
| | | | |
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of Ownership |

**SECTION C** Enter the information required for each corporation or LLC, if any, that owns an interest of ten percent (10%) or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of Ownership |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file. *(See instructions if you need to make changes)*
○ Blacken circle if you need forms to change the registered agent or registered office information.

Agent: **David Ryza**

| Office: **5496 March Street** | City Robstown | State TX | ZIP Code 78380 |
|---|---|---|---|

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or member and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ *David Ryza* | Title CFO | Date 12/01/2009 | Area code and phone number ( 361 ) 387 - 7488 |
|---|---|---|---|

20.     Plaintiff always referred to his interest in Colt as a 15% owner and later as a "silent partner" along with his co-owners Aguilar, Booker, and Nevilles, who together were all the owners of Colt (or as to Booker and Nevilles, a joint venture that together owned 100% of the equitable right to compel Colt's distributions [herein the "Joint Venture"]) notwithstanding the recorded

member-ownership only in Aguilar and Plaintiff. Not only was the "Equity" interest referenced above and herein defined and described was a legal and enforceable right to a specific percentage of all distributions to all members of the Joint Venture and a right to a specific percentage of all net proceeds realized upon the sale of Colt if any sale occurred, in fact Colt performed by making those distributions periodically for eight (8) year to Plaintiff and Plaintiff's wife Lisa Liserio.

21.     Plaintiff's initial agreement to receive 15% of all equity and of all the distributions made to members of the Joint Venture, included a right to receive 15% of the net proceeds of any sale of Colt. Although Aguilar confirmed on numerous occasions his receipt of his share of distributions, Aguilar was seldom involved in any operations or decisions of Colt, opting to manage and operate Total Tank and function as an employee of the Nevilles owned business ETS Oilfield Services, LP.

22.     Importantly, Plaintiff did not have access to the accounting decisions made by Colt's professionals regarding how to handle the management or the "Distributions" agreement based on the equity ownership of the partners. However, until mid-2016 Plaintiff was always able to ask if there were accounting or related issues, and Nevilles would direct the accounting department to respond. The Distributions were sometimes recorded as a K-1, or a Form 1099, or on occasion, simply paid net of all payroll distribution. Plaintiff was not concerned by the nature of the Distributions inasmuch as Plaintiff's share in any such distribution was always subject to the same taxation and tax rates and Plaintiff always wanted to cooperate with the accounting decisions made.

### D.     Colt's Operations From Formation to July 2016

23.     In reliance on these Agreements, and as a result of Plaintiff's interest in Colt and Plaintiff's expectations of the financial value of their equity ownership in Colt upon a sale, Plaintiff performed his work and duties without criticism or complaint from his partners. In fact, Plaintiff

received their pro-rata 15% of distributions made by Colt from 2009 as regular annual and sometimes quarterly payments, under the written evidence of the equity agreement evidenced by the writing above; and the actual payment of "distributions"; and the continued reaffirmation of Plaintiff's equity ownership by these payments, and by the statements, promises, representations and conduct of these Defendants and Nevilles. But for these agreements, and the payments, promises, and conduct reaffirming Plaintiff's right to the equity and distributions under these Agreements, Plaintiff would not have remained in Wyoming and spent eight years building the value of Colt and causing Colt to perform all of the work that reflects Colts' value. But for these agreements, and the payments, promises, and conduct reaffirming Plaintiff's right to the equity and distributions under these Agreements, Plaintiff would not have loaned vehicles, equipment and delivered their own equipment and property to Colt on Colt's credit and promise to pay for same sometime in the future. Had Plaintiff known that the Defendants would actually deny that Plaintiff was an owner of Colt, he would have acted long ago to protect his rights and interest. The Defendants told Plaintiff exactly the opposite – they would all benefit hugely by a sale of Colt if one could be arranged.

24.     Plaintiff Liserio that he had also received his distributions as a silent partner, which gave Plaintiff comfort that he was being treated fairly. Throughout this Joint Venture's operation, and through July 2016, Plaintiff believes that he received Colt distributions in his pro-rata share with Aguilar, Booker and Nevilles and Booker assured Plaintiff that although all arrangements would be handled through Booker regarding the acquisition of Colt business (Plaintiff was not to be involved in solicitations for business, only field operations).

25.     Throughout this Joint Venture's operation, and through July 2016, Plaintiff believed that he received Colt distributions in his pro-rata share with Aguilar, Booker and Nevilles and Booker assured Plaintiff that although all arrangements would be handled through Booker

regarding the acquisition of Colt business (Plaintiff was not to be involved in solicitations for business, only field operations).

**E.     Field and Non-Field Management Decisions of Colt Up to June 2016**

26.     Plaintiff was an experienced oil field services professional specializing in the management of complex Torque and Testing services all parties knew that Plaintiff was highly respected within the oil and gas sector and industry in particular in Wyoming, Texas, Louisiana and North Dakota.   Because neither Aguilar nor Booker had any field experience in Torque and Testing, Plaintiff ran all of the Torque and Testing field work.  Although Plaintiff was to handle all field Torque and Testing work, it was Booker who arranged the business for Colt in Wyoming, Texas, Louisiana and North Dakota.

27.     QEP was essential to the success and profitability of Colt and in fact represented the vast majority of the work performed by Colt.  During this same time, Booker was the person that controlled the QEP business through a relationship as its consultant for field services, but by which such relationship Booker was able to obtain the millions of dollars in work that QEP through Booker directed to Colt.  Accordingly, because Plaintiff Liserio could not (per the instruction of Booker) promote or arrange pricing and thus no new business for Colt, Booker was vital to the financial success of Colt.  Although Plaintiff had no input nor right to negotiate contracts for QEP business, Plaintiff knew that the charges negotiated by Booker were above market, making profitability an important consideration to Plaintiff.  Plaintiff was frequently approached by people in the field complaining that QEP would not even talk to them about business or pricing of business. However, Plaintiff realized that the quality work he controlled was vital to the Colt profits, and although he reported these conversations and criticisms to Booker, Plaintiff believed in his work and in its value to both Colt and QEP, so Plaintiff did little to promote any new business opportunities for Colt.

### F.    Colt's Cross-Business With Its Affiliate Total Tank To Use Its MSA's

28.    Colt has always been in the business of "Torque and Testing" and the affiliate company started and operated by Aguilar, Total Tank did not perform Torque and Testing operations and thus did not compete with Colt.  Total Tank's business included supplying and servicing oilfield related tanks and storage (including frac, acid, sealed and open top Tanks) as well as Fluid Services (including mixing plants, completions fluids and filtration units "Tanks and Fluids") and as (non-competing affiliates) they both utilized as their respective source of revenue all of their service business based through rights granted by the various respective customers' "Master Service Agreements" ("MSA").  MSA are issued from time to time by their customers to both Colt and Total Tank, without an MSA customers would not accept bids, much less work, from a service company.  Thus, the MSA had considerable value to the holder, as the MSA allowed and provided the conditions by which either Colt or Total Tank were permitted to render their respective services to these customers.

29.    Colts business was almost exclusively through an MSA issued by QEP, with a small portion from another customer, while Total Tank had a smaller business, less revenue, but a larger number of MSA's because the Total Tank business generated smaller billings but from more customers.  It was the normal course of Colt's business, however, to utilize the MSA of a Total Tank customer in performing any Torque and Testing services to Total Tank's customers that needed Torque and Testing (a service that Total Tank could not supply or perform).  On those occasions, Colt would do its work under a Total Tank MSA who would do the billings for the Torque and Testing to the Customer, then reimburse Colt for the payment received.  Plaintiff was told and promised, and had actual knowledge on occasions, that all such billing payments would be turned over to Colt when received, from which Colt would make its distributions to Aguilar and its three (3) silent partners.  With Nevilles in charge of distributions this was not an issue since

Total Tank could not compete with Total Tank by taking its receivables, even if generated pursuant to a Total Tank MSA.

30.     This use by Colt of Total Tank's MSA's is important to the accounting for the true value of Colt, such that Total Tank's withholding reimbursements for Torque and Testing services by Colt would effectively charge all expenses to Colt, and give all revenue to Total Tank, completely and materially distorting the values of both companies

**G.     The ETS Dispute And the Reorganization of Colt**

31.     Sometime in 2012 or 2013 Nevilles, while still operating Colt, was also operating a company owned by Aguilar known as ETS that did not compete with Colt.  In 2013 Nevilles arranged for his purchase of ETS from Aguilar and his partners for $20,000,000.00, of which $16 million was paid in cash and $4 million in the form of an unsecured promissory note from ETS to Aguilar (the "Aguilar Note").   Aguilar then went to work for ETS as a senior sales person.

32.     In early 2016, after the oil price crash of 2014-2015, Defendant Aguilar and Nevilles (who owned ETS Oilfield Services, L.P.) had dispute over the timely payment of the Aguilar Note.

33.     Plaintiff was not involved in any of the ETS business but was contacted by Booker in June of 2016 claiming that Nevilles was cheating Aguilar out of payment of the ETS Note and that Aguilar had quit the employment of ETS.  Booker indicated that Nevilles was removed from, or Nevilles quit Colt and had given up his ownership in Colt.  Booker indicated that going forward if Plaintiff Liserio would remain in the employment of Colt that the percentage equity would be increased to 25%.  Because Plaintiff worked closely with the silent partner Nevilles who had terminated his silent partner interest in Colt, Plaintiff was concerned about the Colt business going forward and doing business only with Aguilar and Booker.

### H.     The 2016 Agreement

34.     Because Plaintiff had dealt almost exclusively with Nevilles and Booker in the Colt's operations, Plaintiff Liserio expressed concern over how Aguilar would handle Colt, not knowing the Torque and Testing business.  Booker first told Plaintiff that the QEP business would not go to Nevilles business (ETS) that had been doing some Torque and Testing and QEP business, because Booker controlled all QEP business decisions, and ETS would be denied all business.  Next he promised and represented that the QEP business would remain at Colt so that financially the withdrawal of Nevilles would only improve the Distributions paid to Plaintiff.  Booker finally assured Plaintiff Liserio that he would be certain that the payments of Distributions would be handled correctly so that he and Plaintiff would receive his fair share of the operating profits of Colt just as had been done in the past.

35.     To further assure Plaintiff, Booker told Plaintiff that he instructed Aguilar to put in "a notarized writing" the new distributions percentages now owned by Plaintiff in Colt increasing the Distributions from 15% to 25% and providing that Plaintiff could assign his rights in the 25% equity (something important to Plaintiff to reflect the marriage and family agreements reached between Plaintiff Liserio and Lisa Liserio.   Plaintiff and his wife had initially to change the payee to facilitate banking in Wyoming (because of Plaintiff's travel), and later to expressly to divide Colt income and salaries as among themselves).   Both of these arrangements that had been discussed with Aguilar consented to by Nevilles well prior to his departure from Colt.

36.     Plaintiff Liserio promptly contacted Aguilar about this conversation and Aguilar confirmed Booker's representations, promises and instructions.  Thus, Aguilar and Plaintiff met and Aguilar typed and signed **Exhibit "A"** attached hereto (the "2016 Agreement") binding all of the Colt owners to cause Colt to pay to Plaintiff 25% of "all" of the distributions from Colt made to Aguilar and/or Booker, and 25% of the "net proceeds upon sale" of Colt.

37.     Unfortunately (as noted below), it was Aguilar that determined to write out the "notarized writing" and not a lawyer.  Aguilar intended to reflect the party's agreement regarding the new percentage allocations, that increased the prior oral agreement for allocation of Distributions.  Aguilar had no legal training, nor did Plaintiff Liserio, and the written 2016-Agreement was not the best expression of clarity as to the full description of the party's relationship, or their ownership as owners along with silent partner Booker, who did not have a Colt-recorded ownership interest.  Aguilar even types "*Notary* *Republic*" instead of the proper title of a "Notary Public."  However, the parties intention is clear in that the 2016 Agreement does not contain any inaccuracies:

> I Roy E. Aguilar, acknowledge that Robert Liserio and his assigns or heirs is entitled to twenty-five percent (25%) ***of all distribution from Colt Oilfield Services*** LLC.   The benefactor will also be entitled to ***twenty-five percent (25%) of the net proceeds upon sale of said company***.
>
>                                         Roy E. Aguilar
>                                         [signature]
>
> Notary Republic [sic]
> Lauren Wells  [signature]
> "Seal"
> Notary Public State of Texas
> My Comm. Exp. 04/09/2019
> ID# 26068397

*See*, **Exhibit "A"** attached hereto and incorporated herein by reference and quoted in full above as a true and accurate copy of the 2016 Agreement.

38.     Plaintiff believed the statements and representations of Aguilar and Booker - that they now controlled all activities of Colt and this 2016 Agreement bound Aguilar, Booker and Colt to make the promised distributions, and to pay over to Plaintiff his 25% share of any sale proceeds they arranged on behalf of Colt.

39.     Importantly, this written 2016 Agreement and reaffirmation of the prior Agreements, was executed long after the fiduciary or special relationship arose between Plaintiff

and the Defendants and, in particular, such fiduciary relationship was applicable separate and apart from the 2016 Agreement and its terms, just as special relationship duties arise separate and apart from the contract duties from which they arise.  In fact, Plaintiff relied on the fiduciary or special relationship of trust, guidance, honest and good faith handling of his Colt Distributions and his equity interests in entering into the original agreement, as well as the  amendments reflected in the 2016 Agreement.   Plaintiff relied on Defendants' financial, personal support and guidance, including (i) Bookers' promises and representations during and after the Wyoming trip in 2009; (ii) Aguilar's choice of the words and the terms of the 2016 Agreement and Booker's express agreement, and (iii) the guidance, promises and representations Plaintiff received from both Aguilar and Booker (and earlier Nevilles), both before, as the time of, and arising from the 2016 Agreement; and the performance and conduct of all of the equity owners in honoring the 15% Distributions as in the past.

**I.**     **Promises of Access to The Books And Records <u>After</u> June 2016**

40.    The 2016 Agreement did not provide any manner of review, audit, or even access to the business records and business transactions of Colt or Total Tank, and thus provided no manner to inspect those records.  However, Booker and Aguilar promised to faithfully perform "just as in the past" (which include Plaintiff right to obtain accounting information as needed) but without Nevilles, and Plaintiff justifiably relied on the promises, both express and implied, by  both Aguilar and Booker that Distributions would be made *and accounted for* honestly and that they would cause Colt (and Total Tank as to its MSA-billings or Colt's Torque and Testing) to pay-over to Plaintiff those promised sums, and to truthfully and honestly make pro-rata distributions in the amounts represented to be shared in their respective percentages, and to account to Plaintiff for Colt's business activities and property, including accounting for all sales proceeds for the sale of Colt (and the value from Total Tank as to income derived from  Colt's operations under the

Total Tank MSA's), just as Nevilles had done in the past.

41. In addition to promises of honest accounting, it is clear that Plaintiff contracted to, and was entitled to, a pro-rata 25% of all operation Distributions made to any of the other two Defendants, and a 25% distribution of all "net" proceeds upon sale of Colt, although Aguilar misunderstood the use of the term "benefactor" to mean Plaintiff (and not himself or Colt, as it improperly reads).

**J.      The Fiduciary Duties or Special Relationship Duties of Defendants**

42. Plaintiff has an enforceable contract in initial 2009 Agreements reflected in the Secretary of State of Texas filings, and by the 2016 Agreement, and all owners of interests in Colt are bound by not only those terms but also the duties that arose

      a. as a matter of law, from the Joint ownership and membership in Colt (or the Joint Venture agreements of these owners to own and operate Colt), and

      b. that arose from the Special Relationship of trust arising from the parties lack of bargaining power to inspect, audit, and question the decisions of the Defendants as the Control Group (a lack of power evidenced by the subsequent refusal of Aguilar and Booker to allow Plaintiff to inspect the books and records of Colt in late 2017 and early 2018 when Distributions had ceased yet business increased).

Plaintiff was justified in relying on the Defendants' promises and representations. Accordingly, the accounting, the Distributions, and the negotiations and sale of Colt, were subject to a fiduciary duty of this control group of Colt members and/or the Joint Venture members, who also had full and total control of Colt and Total Tank, and whose manipulations of control caused both Colt and Total Tank to aid and abet the "control group" in breaching their fiduciary and special relationship duties to Plaintiff as a member of the Joint Venture.

43.     Included among the duties breached by the actions of Defendants Aguilar and Booker, acting separately and as the control-persons of Colt, including the Aiding and Abetting of such breach of fiduciary duties by Colt and Total Tank at the direction of Defendants' Aguilar and Booker were:

- A duty to make a full, honest, and accurate disclosure of his fiduciary activities, transactions, profits,[2] the breach of which is a fraudulent concealment[3]

- A duty of loyalty and utmost good faith.[4]

- A duty of fair, honest dealing with Plaintiff.  [*Id. Kinzbach Tool*]

- A duty of candor to Plaintiff.[5]

- A duty to refrain from self-dealing and conduct damaging Plaintiff.[6]

- A duty to act with integrity of the strictest kind.[7]

Likewise, in this case, as is reflected by the written and oral agreements among Plaintiff and the Defendants, alternatively at least a "special relationship" was created, both contractual and non-contractual, including the formation and agreements of the Joint Venture, giving rise to a tort[8] duty of good faith that does not need to rise to the level of a fiduciary relationship[9] that is separate and apart from the contract duties of performance.  This "special relationship" is to be distinguished

---

[2]     *Johnson v. Peckham,* 120 S.W.2d 786, 788 (Tex.1938)
[3]     *Montgomery v. Kennedy*, 669 S.W.2d 309 (Tex. 1984); *City of Fort Worth v. Pippen*, 439 S.W.2d 660 (Tex. 1969); *Kinzbach Tool Co. v.  Corbett-Wallace Corp.*, 160 S.W.2d 509 (Tex. 1942) The breach of the duty of full disclosure by a fiduciary is tantamount to fraudulent concealment.  *Willis v. Maverich*, 760 S.W.2d 642 (Tex. 1988).
[4]     *Kinzbach Tool Co: v. Corbett-Wallace Corp.,* 160 S.W.2d 509, 512 (Tex Sup 1942);
[5]     *Welder v. Green,* 985 S.W.2d 170, 175 (App.--Corpus Christi 1998, pet denied)
[6]     *Dearing, Inc. v. Spiller,* 824 S.W.2d 728, 733 (Tex.App.—Fort Worth 1992, writ denied)
[7]     *Hartford Cas. Ins. Co. v. Walker Cty. Agency, Inc.,* 808 S.W.2d 681, 687-88 (Tex.App.—Corpus Christi 1991, no writ).
[8]     Distinct from the statutory duty of good faith and fair dealings, the common law duty is an ordinary tort, with ordinary damages, including exemplary damages, that are recoverable for a breach of the duty of good faith and fair dealing upon a showing of the same elements that permit a recovery of those damages in other tort actions.  *See, e.g. State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590 (Tex. App. El Paso 1991, writ denied) 18, 1991) and (disapproved of on other grounds by, *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607 (Tex. 1996)).
[9]     The issue of whether a contract contains this duty depends on "[t]he nature of the relationship between the parties, not merely the existence of the contract alone." *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 71 (Tex. 1997).

from traditional obligations arising from fiduciary duties, although a fiduciary duty certainly contemplates, at a minimum, good faith and fair dealing. Here, the "special relationship" arises out of the Joint Venture and is based on extra-contractual duties arising when there is an element of trust between the parties, as is the case here, that is necessary to accomplish the goals of the undertaking or from an imbalance of bargaining power as is clear from Plaintiff's relationship with these Defendants.[10] Plaintiff was required to place his trust in the honest and truthful operations of Colt, and in the accounting of operations by the Defendants Aguilar and Booker to cause Colt and Total Tank to properly and timely account, and as a result of not having access to, or the business training to review and audit, as may be necessary to verify the accounting of Colt and Total Tank (under the direct and total control of Aguilar and Booker) the relationship resulted in the imbalance of bargaining power between Plaintiff and the parties in control of the accounting and operations – namely Aguilar and Booker.

44. In this case, the reliance on the Defendants' honest and truthful accounting was not only that of Colt's duties by its control persons (which owned only a few MSA's significant to its operations) but also Total Tank's duties, because Total Tank had acquired a number of MSA's with vendors that also utilized the Torque and Testing Services. Total Tank had no employees or equipment that would allow it to perform Torque and Testing services and Defendants represented that the obligation of Total Tank to make remittances to Colt when Colt performed under a Total Tank MSA would be actually and honestly done. This representation was important inasmuch as Plaintiff did not have access to any agreement to share in Total Tank distributions other than honest accounting, and thus would be directly and significantly harmed if Total Tank did not remit

---

[10]    *See Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex.App.--Houston [1st Dist.] 1996, no writ); *In re Marriage of Braddock*, 64 S.W.3d 581 (Tex. App. Texarkana 2001); *Lovell v. Western Nat. Life Ins. Co.,* 754 S.W.2d 298 (Tex. App. Amarillo 1988), writ denied, (Nov. 30, 1988); *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763 (1958)

payments for work by Colt (Colt having paid the payroll, supplies and expenses, and furnished the equipment it owned, maintained and insured) resulting in Colt not only losing its income, but absorbing all of the costs to the expense-free income that was converted by Total Tank as if its own revenues were received.

45.    In addition to not having access to account records or transactions, Plaintiff furnished equipment and vehicles in late 2016 to aid Colt in maintaining its ability to perform the QEP business.  Although Plaintiff Liserio knew of the nature and use of this equipment and the gross income it generated, Plaintiff did not know what expenses were being charged at the direction of Defendants, and thus did not know how Distributions were counted.

46.    It is clear from the formation of Colt, and the oral agreements, promises and representations, and the 2016 Agreement, there was created a fiduciary and special relationship of trust and reliance between Aguilar and Booker on the one part, and Plaintiff on the other, as exists among them as members of the Joint Venture:

    a.    There was a present conveyance of an undivided ownership interest in, and a right to share as an owner in Colt including rights that extended ownership to Plaintiff's *assigns and heirs* (which included each other).

    b.    There was created by written and oral agreements, understanding, promises, the  2016 Agreement and the conduct of the parties a joint ownership of Colt or a Joint Venture of "silent partners" or a partnership relationship among all owners of Colt, giving rise to the special relationship and fiduciary duties set out above.

    c.    The 2016 Agreement was to reward and reflect, but only in part, the long-standing association and work done together between Aguilar, Booker and the Plaintiff, and to induce Plaintiff, and it in fact did induce Plaintiff (i) to continue to remain full time employed with Colt to earn the distributions the owners desired; (ii) to loan equipment and

vehicles to Colt for its use on credit of undefined terms; and (iii) to trust Aguilar and Booker to be honest and furnish full and complete disclosure of all of the Joint Ventures (and Colt's) affairs.

        d.     Aguilar and Booker, as the Colt control persons, possessed and exercised superior bargaining power, and Plaintiff, as minority interest owner unable to require specific access to accounting treatment of Colt's income or to compel acts and conduct of Colt regarding distributions, accounting and the like, had unequal bargaining power and the nature of this business relationship and the 2016 Agreement was such that Aguilar and Booker could easily take advantage of Plaintiff; that is, there was a significant imbalance of bargaining power between Aguilar and Booker, who was in in total and exclusive control of the accounting and business decisions regarding income and accounting for distributions by Colt. Thus, the nature of the relationship between Plaintiff, Aguilar and Booker, was fiduciary, as well as (or alternatively) arose from a "special relationship" recognized under the common laws of the State of Texas as arising from the in-fact element of trust that is necessary to accomplish the purpose and goal of the various agreements, promises, and the 2016 Agreement, all arising from the Joint Venture agreement.

## K.    Aiding and Abetting Breach of the Fiduciary or Special Relationship Duties

47.    Because Colt and Total Tank were entirely under the control of Aguilar and Booker, and their corporate decisions were entirely that of Aguilar and Booker, both Colt and Total Tank (regarding the MSA remittances due) are fully and completely responsible for the performance of the commitments and promises of the "control group" and were either fiduciaries or in the same special relationship to Plaintiff with duties owed Plaintiff, or their conduct directed by Aguilar and Booker made their conduct aiding and abetting the breach of the duties owed by Aguilar and Booker. Thus, in all events, the Aguilar's and Booker's liability is joint and several for the

damages resulting to Plaintiff as set out herein, and arising from their conduct as well as the conduct of Colt and Total Tank.

48.     Only as a result of this 2016 Agreement and the oral promises regarding the accounting, distributions, and sale proceeds, did Plaintiff Liserio continue in the business working full time, and faithfully executing all of his Colt-responsibilities, without complaint until early 2018.   Directly as a result of such work and contributions in reliance on the oral promises and representations, and the 2016 Agreement and the related oral promises from the Defendants, Colt had been highly profitable such that Colt was clearly a prospect for an industry purchase or merger which did occur in 2018, when PetroStar paid a net $32,318,140.00 for the acquisition of Total Tank Systems, LLC, Pacesetters Services, LLC, and Colt Oilfield Services, LLC, collectively.

**L.     Plaintiff's Recognition That No Distributions Were Being Made Even Though Colt Remained Highly Profitable and Busy Raised Requests for An Accounting**

49.     Although there has been partial performance of this 2016 Agreement by Defendants, in that some of the distributions the Plaintiff as a member of the Joint Venture were shared 25% with Plaintiff, it was becoming apparent that beginning in 2017 significant distributions were made to Aguilar and Booker, or distributions made by Colt to or for the benefit of Aguilar and Booker, that were not made, much less contemporaneously made, to Plaintiff on his 25% interest in all distributions.

50.     Although Plaintiff did not have access to Colts books and records, and questions to Aguilar and Booker about Distributions were ignored, Plaintiff knew the gross billings of Colt as a result of his field management over all Colt field operations.   Plaintiff would furnish weekly gross revenues to the Colt accounting taken from his notepad reflecting work done during each week, and throughout 2017 and the first quarter of 2018, revenue was constant or increasing from periods before.

51.    However, in late 2017 and unknown to Plaintiff, Booker and Aguilar decided to aggressively, but secretly, begin to market both Colt's and Total Tank's assets and business. Neither Aguilar nor Booker ever told Plaintiff, of their implemented plan to market these businesses, although Plaintiff had a protected right to know.  It was also during this time that Aguilar started to become more and more agitated with Plaintiff's questions about distributions, and requests to receive Distributions or to examine the accounting records of Colt.

52.    Aguilar began confronting Liserio on business matters that suggested that Colt was not doing well to justify why Colt did not make a distribution to Plaintiff at year end, which was a standard practice.  Aguilar began blaming this alleged slow-down on Plaintiff even though Aguilar knew that Plaintiff had the weekly revenue numbers showing no slow-down in business.

53.    Plaintiff knew that all during 2017 the average monthly gross revenues for Colt was continued steady, and business was stable. At this same time, Plaintiff went to the Colt Poteet yard and saw a huge shipment of new equipment *for Total Tank* (filtration pods, diesel water transfers, etc.) and Plaintiff confronted Aguilar about the equipment and the claims that Colt was not doing well.  This angered Aguilar who refused to discuss where Total Tank obtained funds for such large purchases, but Colt had no available funds.   As Plaintiff has discovered the following are the reported Gross Receipts, which Plaintiff believes are low:

|                | 2018      | 2017      |
|----------------|-----------|-----------|
| Gross Receipts | 8,161,658 | 9,215,774 |

Incredibly, Plaintiff was paid *no year-end distribution in 2017 or 2018* and no right to review the books and records to explain how this could be true.  Likewise, throughout 2017 to early 2018, significant income has been received by Total Tank and/or the Defendants-Aguilar and Booker or other affiliates, directly related to work performed in the Torque and Testing services by Colt (but

under the Total Tank MSA) for which Plaintiff believed reimbursements were not made to Colt, and thereby distributions to Plaintiff avoided. Plaintiff also believed that certain of the commercial and business opportunities which should have been provided to Colt, had been channeled to other entities or persons or Affiliates so as to avoid the 25% distribution obligation of Colt (again, a Distribution controlled by Aguilar and Booker and the accounting for these cross-affiliate transactions).

**M. Aguilar and Booker Make Millions While Telling Plaintiff Colt Cannot Afford Any Distributions**

54. Recall that Booker and Aguilar in mid-2016 induced Plaintiff to remain with Colt and the joint venture, however, unknown to Plaintiff, secret negotiations began in late 2016 by and among Booker, Aguilar and the third-party purchaser of ETS (as company known as Yellowjacket) to pay millions of dollars to Aguilar as purported "commission" to "arrange" QEP business for ETS (a scheme to allow Aguilar to be paid on the Aguilar Note). Thus, while Aguilar (and likely Booker) were sharing in more than $2.1 million in phony commissions paid by ETS for the QEP work, Aguilar was telling Plaintiff that Colt was not making enough money to pay Distributions.

**N. Defendants' Secret Negotiations to Sell Colt and Scheme To Force Plaintiff To Quit Employment With Colt**

55. While Aguilar is pocketing millions from phony commissions on QEP work, and millions more from the operations of Colt, in late 2017 and continuing through mid-2018, Aguilar and Booker had commenced secret negotiations with potential acquirers of Colt's and Total Tank's assets and operations, including the negotiations with a company that ultimately paid to Aguilar and Booker a net $32,318,140.00 for the acquisition of Total Tank Systems, LLC, Pacesetters Services, LLC, and Colt Oilfield Services, LLC assets and business. At the same time, in late 2017 and early 2018, Aguilar and Booker began a scheme to force Plaintiff to quit the employment of Colt, so that Plaintiff would not discover the negotiations or the sale (or at least not discovery same

before Aguilar and Booker could get their hands on the sale proceeds and not split such proceeds pursuant to the Plaintiff's Agreements.

56.     The scheme began by Aguilar refusing to discuss the lack of Distributions, other than to refuse access to the accounting records.  After a number of informal conversations and questions by Plaintiff to and with Aguilar, in Spring, 2018 those demands and conversation became more and more heated.  Plaintiff directly confronted Aguilar about the lack of distribution payments and lack of accounting notwithstanding the substantial business and clearly apparent profitability of Colt.  This time Plaintiff asked Aguilar to join him for lunch in an effort to gain access to the books and records.  When Plaintiff greeted Aguilar at the lunch meeting, Aguilar asked Plaintiff "are you a vindictive person?"  Plaintiff answered "no" believing the question was just small talk, not thinking it was a forecast of things to come.  However, when Plaintiff made his specific demand to be allowed to review the books and records of Colt and Total Tank, Aguilar's response was to not only refuse all access to all books and records of Colt but state to Plaintiff that "no one is going to look at my books".  Then Aguilar announced to Plaintiff that Colt would not be making ***any further distributions*** to Plaintiff, nor would he discuss his or Bookers payments in 2017 or 2018, stating that neither Colt nor Total Tank would ". . . pay you (Plaintiff) anything more on our contract."  Plaintiff was shocked because Colt had made more gross sales in 2017 than in any prior year and knew that profits should have been substantial and 2018 had started off even better.

57.     In response to these shocking statements, Plaintiff did as he had done in the past and called Booker for help in pursuing the accounting and getting paid his distributions.   Booker acted as if he did not know anything about Aguilar's position, and said he would talk to Aguilar. Neither Aguilar or Booker made mention of the ongoing marketing of Colt or Total Tank, or of any negotiations ongoing or proposed for the sale of Colt or Total Tank with prospective

purchasers, or discussed the distributions they had received to date. Thereafter, Booker replied to emails or telephone calls, and in fact never contacted Plaintiff after his promise to talk with Aguilar about an accounting. Booker simply avoided or ignored Plaintiff's further efforts to talk.

58. Plaintiff had no idea that a multi-million sale was being negotiated, and only realized that if no Distributions were to be made, and Defendants knew that Plaintiff would be forced to seek employment elsewhere to make up for the Distribution income that had suddenly gone away. Only after Plaintiff was refused all access to the financial records of Colt and Total Tank, and the relationship between Plaintiff, Aguilar and Booker deteriorated to literally no contact, (Aguilar hardly speaking to Plaintiff, and Booker refusing to take calls), as a direct and proximate result of this breach of the duties owed Plaintiff and the breach of the oral promises and their 2016 Agreement and the anticipatory breach of their oral and written agreements, did Plaintiff shortly thereafter leave the employment with Colt.

59. Even at this announced departure, there was no mention of any ongoing or proposed negotiations for the sale of Colt or Total Tank. At this point Plaintiff had no idea that the design and scheme of Defendants was to force Plaintiff to quit all employment and dealings with Colt and the Defendants so they could secretly close a sale without disclosing to Plaintiff or the prospective purchaser of the Plaintiff interest in the sale proceeds. Defendants were knowingly, intentionally, and fraudulently not disclosing information that Plaintiff had a legal right to, and Defendants had a legal duty to furnish.

60. This lack of knowledge by Plaintiff was a direct and proximate result of the knowing and intentional fraud by omission committed by Defendants breaching of all of the duties to act with in good faith consistent with their fiduciary or special relationship duties and obligations to do so, as well as the contract obligation to have made and continue making the distributions promised. Most critically, Booker and Aguilar made the decision to not tell Plaintiff that Colt was

the subject of marketing efforts and ongoing sale negotiations because they knew that if Plaintiff knew his interests was up for sale, Plaintiff would insist on their pro-rata share. Thus, all Defendants participated in, or were controlled to aid and abet in the breach of the fiduciary or special relationship duties owed to Plaintiff, including the scheme of fraud by omission in forcing Plaintiff to leave the employment of Colt.

**O.  Defendants Arrange A Secret Sale of Colt for Many, Many, Millions In Their Pockets**

61.     Plaintiff now believes that Defendants-Aguilar and Booker had paid themselves millions of dollars in Distributions from Colt (and from value of Colt business taken from Colt by Total Tank) and paid or diverted those Colt dollars to Defendants-Aguilar's and Booker's other companies (including Total Tank through non-reimbursement of Colt's work done under the Total Tank MSA's) and made distribution to themselves in 2017 and 2018 from these revenues due from Colt without distributions to Plaintiff.

62.     This fraud by omission, and breach of fiduciary duties and breach of contract to pay annual distributions and duties, however, pales to what Plaintiff discovered that Aguilar and Booker received from their secret negotiations for, and the selling of, Colt and/or Total Tank commencing before and during the time period surrounding the restaurant meeting. Although Plaintiff did not understand the conduct of Defendants, and had some suspicions well after the time of the lunch meeting that they had been lied to for a purpose, it was only in late August 2018 that Plaintiff heard industry rumors that in fact a sale of Colt and Total Tank had occurred. However, Plaintiff did not know until around September 16, 2018 that Defendants had negotiated a sale of both Total Tank and Colt to a newly formed entity known as "PetroStar Services, LLC", pocketed well in excess of $32 million, and now planned to deny that Plaintiff ever had a right to an ownership interest in the sale proceeds.

63. The information discovered by Plaintiff includes a public announcement of PetroStar to its employees, on or around a **September 18, 2018**, of the acquisition just discovered by Plaintiff. This announcement likewise discloses the retaining, by the newly acquiring Petrostar, of two of the three (3) Colt owners, Aguilar and Booker, both who owned an interest in Colt since prior to 2010, and both of whom shared in the sale proceeds of this sale. The information published in this public announcement of by Petrostar to its employees touted *Terry Booker as "our new Chief Executive Officer"* – from a "silent partner" to CEO of Colt:

> Please find attached the exciting & important company news letter by Eddie Aguilar. PetroStar Services, LLC is pleased to announce the acquisition of Total Tank Systems, Colt Oilfield Services, LLC and Pacesetter Services, LLC. As a wholly owned subsidiary of PetroStar Holdings, LLC, PetroStar Services will continue to be based in San Antonio, Texas under its current leadership and management team.
>
> Further, PetroStar Services, LLC is planning additional investments that will increase our growth and capacity in the oil and gas industry. This will give our company a more substantial presence in which will further strengthen our mission to be a truly national organization. Meanwhile, we welcome our new Chief Executive Officer, Terry Booker and PetroStar Services, LLC to our family.

This public announcement was the first time Plaintiff was shown the truth of what Defendants had done, had planned to do while being their Joint Venturers, and the first time known to Plaintiff that Defendant Booker publicly connected his active participation in Colt to the Public.

**P.    Defendants' Conduct Breached all of the Agreements, Promises and Representations Made to Plaintiff, and All of the Duties Owed To Plaintiff**

64. Plaintiff alleges that Defendants conspired through fraud, breach of their duties, and breach of their contracts and agreements with Plaintiff to deprive Plaintiff of his rights and interest in Colt and their right to 25% of Colt's value (including the value attributed to Total Tank

for Colt-performed work) paid by the purchaser, and thus, Defendants are jointly and severally liable to Plaintiff for the breach of the duties and obligations arising from the fiduciary relationship or the special relationship, and the oral agreements and written 2016 Agreement.

65. The Defendants knowingly and intentionally acted to violate their fiduciary or special relationship duties owed to Plaintiff, and/or acted in bad faith, and with malice and fraud with dishonest intent, in their conduct of withholding distributions, hiding the negotiations for, and the sale of, Colt (and Total Tank as to value paid as a result of denuding Colt's assets and receivables and delivering same to Total Tank) and ultimately:

      (i)     by applying the proceeds of Colt account receivables for Colt services but collected by Total Tank "as if" such income belonged to Total Tank; and

      (ii)     by the wrongful repudiation of the oral agreements evidenced by the promised equity of Liserio, as well as, and as reflected by, the distributions provided in the written 2016 Agreement; and

      (iii)     by receipt of the many millions of dollars received by Aguilar and Booker from the PetroStar sale proceeds and refusing the payment to Plaintiff of what is rightfully and in equity are Plaintiff's property and funds.

Plaintiff should in equity and good conscience, and pursuant to the Defendants' written and oral promises, the written 2016 Agreement, and the fiduciary and special relationship duties owed by Defendants to Plaintiff, be entitled to receive from Defendants Aguilar, Booker, and Colt:

      (i)     his 25% of the total sale proceeds attributable to the sale of Colt paid to Aguilar or Booker; as well as

      (ii)     the equitable interests in Total Tank attributable to the unreimbursed monies, funds, distributions (direct or in kind) beginning January 1, 2016 to the presence reflected in payments to Aguilar and Booker for their interests in Total Tank;

(iii)    25% of all equity in PetroStar paid or transferred to Aguilar and/or Booker; and

(iv)    25% of all funds, bonus, earn-outs or the like that remains unpaid or unearned, as the case may be, and due Aguilar and/or Booker.

66.    Plaintiff also alleges that Colt and Total Tank were operated to perpetuate a fraud on the Plaintiff by omission and concealment, and the control group Aguilar and Booker used and directed the actions of Colt and Total Tank so as to hide the true value of both, hide the comingling of Colts assets into Total Tank, to defraud by omission Plaintiff, and to aid and abet Aguilar and Booker in the breach of their fiduciary or special relationship duties owed to Plaintiff.  As a result, all Defendants are jointly and severally liable to Plaintiff for all actual, consequential and other damages, including punitive damages for the fraud designed to breach the fiduciary and special relationship duties due Plaintiff.

67.    All conditions precedent has been met or occurred by Plaintiff or have been waived by Defendants.

## IV.
## COUNT ONE
### BREACH OF FIDUCIARY DUTY OR DUTY OF GOOD FAITH AMONG MEMBERS OF THE JOINT VENTURE, INCLUDING CAUSING COLT AND TOTAL TANK TO AID AND ABET THE BREACH OF THOSE DUTIES

68.    Plaintiff incorporates in this Count the facts and conclusions as set out in ¶¶ I through 67.  The term "Defendants" in this Count One does not include Total Tank.

69.    Plaintiff is in a fiduciary to, or in a special relationship with Plaintiff, arising not only from the obligation of Defendants to fulfill their duties and obligations as partners or joint venturers with Plaintiff, but also their continuing duty to account for Distributions by Colt that were made or should have been made or caused to be made by Colt to Plaintiff as an owner of equity in Colt.

70. Plaintiff was a joint "equity" owner in Colt and as a result of this partnership or Joint Venture, Defendants Booker and Aguilar owed Plaintiff a fiduciary duty as among partners, and as among the control persons of Colt and Total Tank, all of which duties have been breached.

71. Defendants have breached the fiduciary or special duties owed among members of Colt to

a. Be honest and forthright in all of their dealings with Plaintiff regarding Colt and all of Colts dealings and transactions.

b. To timely and accurately account for all of the transactions of Colt, including all transactions of Colt that directly or indirectly benefitted Defendants or by which Defendants profited.

c. To pay over to Plaintiff all Distributions as agreed and promised from both operations and the sale of Colt.

d. To not use opportunities and assets of Colt for the personal benefit of individual members in breach of their fiduciary duties or the duties that arise from the special relationship of trust existed between Defendants and due to Plaintiff.

e. To not convert to the benefit of Defendants and at the expense of Plaintiff, the assets, funds, right and opportunities of Colt, a significant portion of which are due and owed to Plaintiff.

72. Defendants have made or caused to be made distributions of funds or of opportunities that reflect the value of distributions, to the Defendants themselves and to other insider-third parties and Affiliates, and such distributions, to the extent made, are burdened by the legal and equitable rights and ownership of Plaintiff arising from the 25% interest in all such distributions as provided in the 2016 Agreement, together with all damages arising from breach of such duties. These acts and conduct, arising from the fiduciary or special relationship, is in breach

of the multiple duties that arise from the fiduciary relationship or special relationship.

73.     Plaintiff was in a position that it must rely on the honesty and truthfulness of Defendants in their dealings, reporting's, conduct, and transactions with Colt and Plaintiff had such an un-equal bargaining position as to give rise to the injury suffered by Plaintiff was the cause-in-fact of the Plaintiff's injury and was a foreseeable consequence of the knowing and intentional breach of these duties fiduciary and special relationship duties.

74.     Plaintiff is entitled to recover all actual, economic damages jointly and severally from these Defendants, arising from the injury proximately caused by the breach of duties, and the aiding and abetting breach of those duties owed Plaintiff, resulting in a direct and pecuniary benefit to the Defendants or any one or more of them, and a judgment, therefore.

75.     Plaintiff is entitled to recover punitive damages from all Defendants, jointly and severally, for the deliberate and intentional breach of the fiduciary or special duties owed by Defendants to Plaintiff, through the scheme to knowingly and intentionally breach those duties, to defraud Plaintiff, to convert Plaintiff's rightful property and property rights held pursuant to the fiduciary or special duties, which actions were taken with actual malice or gross negligence of the Defendants, jointly and severally against all Booker and Aguilar.

76.     The Defendants have been unjustly enriched by their wrongful conduct in breach of their duties owed to Plaintiff and all property received and in equity cannot profit from their breach of duties, all of which profits must be forfeited and Plaintiff is entitled to an order of forfeiture of the consideration paid to Aguilar and Booker (either directly or indirectly) and for all other damages, actual, consequential and punitive, due Plaintiff and a judgment therefor.

**V.**
**COUNT TWO**
**CONDITIONED REQUEST FOR AN ACCOUNTING**
**(subject to a finding of a Fiduciary or Special Relationship)**

77.     Plaintiff incorporates in this Count the facts and conclusions as set out in ¶¶ 1 through 67.

78.     Plaintiff is in a fiduciary or special relationship with Defendants, arising not only from the obligation of the oral agreements to make distributions, including distributions under the 2016 Agreement, but the continuing duty to cause future distributions to be made from all property received as a result of the breach of those duties.

79.     The duty to fully and faithfully account for the transactions of a contract party or counter-party, in particular a contract such as the 2016 Agreement for all transactions from January 1, 2016 through judgment, that is dependent upon accounting for financial transactions, giving rise to the right to an accounting to verify both contract performance and full performance.

80.     But for an accounting, Plaintiff cannot be assured of his actual or complete rights arising from the fiduciary or special relationship, as well as the 2016 Agreement performance, and accordingly, such equitable remedy is appropriate to afford a remedy for the enforcement and performance of the 2016 Agreement.

81.     Plaintiff seeks and order for an accounting duty and obligation of Defendants under the fiduciary or special relationship, including the duties arising from the 2016 Agreement and beginning January 1, 2016 to the time of any final sale of Colt and Total Tank, and funds paid over to or accounted by the Defendants for their interest in Colt or Total Tank.

## VI.
## COUNT THREE
## BREACH OF CONTRACT – DAMAGES AND SPECIFIC PERFORMANCE

82.     Plaintiff incorporates in this Count the facts and conclusions as set out in ¶¶ 1 through 67.  For the purpose of these Counts for Recovery and Damages, "Defendant" shall mean solely Aguilar, and shall not include Booker, Total Tank or Colt.

83.     Plaintiff has an enforceable contract in the 2016 Agreement and Defendant Aguilar is bound by the unambiguous terms of the Contract setting forth the two unambiguous terms of 25% of proceeds – first, of all distributions made by Colt (fairly accounted for to include work performed by Colt pursuant to MSA owned or held in the name of Total Tank) from October 1, 2016 to the sale of Colt to PetroStar; and – second, upon the receipt of proceeds (or all consideration received) from such sale of Colt from PetroStar, or to be earned by such sale, from Defendant Aguilar.

84.     Plaintiff is the party entitled to enforce the oral promises and the promises set out in the 2016 Agreement, and is the sole party entitled to all of the benefits therefrom.

85.     Plaintiff performed all of his obligations under the contact, and Plaintiff was excused from any performance after the anticipatory breach of Plaintiff's contract, including the oral and written contracts between the parties.

86.     Defendant Aguilar materially breached, or caused to be materially breached, the oral promises and agreements, including the 2016 Agreement or caused, by his control, Colt and/or Total Tank to breach the oral promises and agreements made by Aguilar, including the 2016 Agreement by failing to pay the 25% distributions and by Defendant's fraudulent conduct in anticipatory breach of contract by announcing their intention not to pay Plaintiff for any future distributions or pay Plaintiff's 25% of the net proceeds when Colt sells.

87.     Each such breach and fraudulent anticipatory breach constitutes a material breach of contract, the proximate result of causing Plaintiff to suffer actual, consequential and special damages.

88.     Plaintiff seeks all damages resulting from the past breach of the 2016 Agreement in accordance with Texas law, including judgment for all amounts of distributions that have been

earned and distributed, or which should have been distributed, by Colt in accordance with the 2016 Agreement for the years 2016, 2017, and YTD 2018.

89.     Specific performance is an appropriate equitable remedy in this case that may be awarded at the trial court's discretion upon a showing of breach of the oral and written 2016 Agreement, or upon the showing of an anticipatory breach of the 2016 Agreement, inasmuch as money damages would not be an adequate remedy where the amount actually due under a contract in the future are not liquidated.

**VII.**
**COUNT FOUR**
**ALTERNATIVELY, IF NO CONTRACT**
**MONEY HAD AND RECEIVED**

90.     Plaintiff incorporates in this Count the facts and conclusions as set out in ¶¶ 1 through 67.   The term "Defendants" in this Count Four refers only to Aguilar and Booker.

91.     Money Had and Received is an equitable doctrine applied to prevent unjust enrichment."[11]

92.      The Defendants Booker and Aguilar hold money that belongs to the Plaintiff in equity and good conscience.[12]

93.      As a result of the sale of Colt and Total Tank, Defendants Aguilar and Booker received funds and property belonging to Plaintiff, and Defendants hold money and benefits rightfully due to Plaintiff.  In fact, Plaintiff had a current, oral and written right to all such funds, and a current transfer of those right to the monies or the money equivalent (including properties converted in the sale of Colt and Total Tank), including rights in Plaintiff and his heirs and successors.

---

[11]      *Gatesco, Inc. Ltd. v. City of Rosenberg*, 2010 Tex. App. LEXIS 2559, *7, n. 4 (Tex.App.—Houston [14th Dist.] 2010, no pet.) (quoting *Hunt v. Baldwin*, 68 S.W.3d 117, 132 (Tex.App.—Houston [14th Dist.] 2001, no pet.)
[12]      *Edwards v. Mid-Continent Office Distribs.*, 252 S.W.3d 833, 837 (Tex.App.-Dallas 2008, pet. denied).

94.     When Defendants Booker and Aguilar obtained funds rightfully belonging to Plaintiff,[13] they did so wrongfully, fraudulently, with malice and in breach of their duties due Plaintiff.  Accordingly, Defendants are liable to Plaintiff, jointly and severally, for actual and punitive damages, for which Plaintiff seeks judgment.[14]

95.     Plaintiff is entitled to recover exemplary damages based on the fraudulent and malicious actions of Defendants or any one of those acting with fraudulent intent and malice, or in aiding and abetting the breach of duties described herein.

## VIII.
## COUNT FIVE
## ALTERNATIVE RELIEF - PROMISSORY ESTOPPEL

96.     Plaintiff incorporates in this Count the facts and conclusions as set out in ¶¶ 1 through 67.  For the purpose of these Counts for Recovery and Damages, "Defendants" shall mean only Aguilar, Booker, and does not include Colt or Total Tank.

97.     Defendants made promises to Plaintiff, both orally and in writing, and inferred from their conduct or silence.[15]

98.     Plaintiff reasonably and substantially[16] relied on the promise to his detriment.

99.     Plaintiff's reliance was foreseeable by the Defendants.

100.    An injustice can be avoided only by enforcing the Defendants promise.

---

[13]     the action is not premised on wrongdoing.  *See Doss v. Homecoming Fin. Network, Inc.*, 210 SW,3d 706, 711 (Tex.App. - Corpus Christi 2006, pet. denied); *Amoco Prod. v. Smith*, 946 S.w.2d 162, 164 Tcx.App.-EI Paso 1997, no writ).

[14]     In an action for money had and received, the plaintiff can recover exemplary damages when there is evidence of fraud or malice. *See Orgain v. Butler*, 478 S.W.2d 610, 613 (Tex.App.-Austin 1972, no Writ).

[15]     Restatement (2d) of Contracts §4; *see, e.g., Fretz Constr. Co. v. Southern Nat'l Bank*, 626 S.W.2d 478, 483-84 (Tex. 1981); A person's silence may constitute a binding promise if, under the circumstances, the person had a duty to speak and did not. *See Ebner v. First State Bank*, 27 S.W.3d 287, 302 (Tex.App.—Austin 2000, pet. denied).

[16]     Reliance is substantial if the plaintiff shows that but for the promise, it would not have acted or refrained from acting. *eg., Traco, Inc, v. Arroth Glass Co.* 814 S.W.2d 186, 192 (Tex App -San Antonio 1991; writ denied)

101.     Accordingly, Plaintiff is entitled to the actual damages for Defendants refusal to perform, failure to perform, jointly and severally from each Defendant.

### IX.
### COUNT SIX
### FRAUD BY NON-DISCLOSURE

102.     Plaintiff incorporates in this Count the facts and conclusions as set out in ¶¶ 1 through 67.  For the purpose of these Counts for Recovery and Damages, "Defendants" shall mean Aguilar, Booker, and Colt, and does not include Total Tank.

103.     Plaintiff had rights, including property rights, related to the operations of Colt and Total Tank (only to the extent of converting Colt's assets), or to the proceeds of the sale of Colt.

104.     Defendants concealed from or failed to disclose certain facts to the Plaintiff directly related to the operations and sale of Colt and Total Tank.

105.     The undisclosed facts were material, and the non-disclosure deliberate in furtherance of a scheme to defraud the Plaintiff.

106.     The Defendants had a duty to disclose the facts to the Plaintiff and failed to disclose the whole truth, in breach of their fiduciary or special relationship duties.

107.     The facts were material facts directly related to the operations and sale of Colt and Total Tank.

108.     The Defendants knew: (i) that Plaintiff was ignorant of the facts; and (ii) the Plaintiff did not have an equal opportunity to discover the facts.

109.     The Defendants were intentionally and deliberately silent when it had a duty to speak, such duties included the fiduciary or special relationship duties.

110.     By failing to disclose the facts, the Defendants intended to induce the Plaintiff to take some action or refrain from acting, which Plaintiff did refrain.

111.     Plaintiff relied on the Defendants nondisclosure and such reliance was reasonable.

112.    The Plaintiff was in fact injured as a result of acting without knowledge of the undisclosed facts, including loss of property and property rights which Defendants are jointly and severally liable.

113.    As a result of the intentional fraud of the Defendants, Plaintiff is entitled to recover punitive damages which Defendants are jointly and severally liable.

## X.
## COUNT SEVEN
## ACTUAL AND PUNITIVE DAMAGES

114.    Plaintiff incorporates in this Count the facts and conclusions as set out in ¶¶ 1 through 113.  For the purpose of these Counts for Recovery and Damages, "Defendants" shall mean Aguilar, Booker, and shall not include Colt or Total Tank.

115.    **Actual Damages**:  Plaintiff seeks to recover all actual and compensatory damages, including economic loss, direct, consequential and special damages, jointly and severally against the Defendants, as allowed by law.

116.    **Reliance Damages**:   Plaintiff is entitled to recover reliance damages arising from reliance on  the fraud foreseeable and directly traceable to the breach jointly and severally against the Defendants, as allowed by law.

117.    **Expectancy Damages**:    Plaintiff is entitled to recover the value of the expectancy that was created by the promise of the Defendants, jointly and severally against the Defendants, as allowed by law.

118.    **Restitution and Equitable Restitution Damages**:  Equitable Restitution Damages including all distributions that should have been made pursuant to is contract.

119.    **Forfeiture Damages**:  Plaintiff seeks to recover forfeiture damages for the knowing and intentional conduct, jointly and severally, in breach of the fiduciary duties and special relationship duties, against the Defendants, as allowed by law.

120.  **Exemplary Damages**:  Plaintiff seeks to recover punitive damages for the knowing and intentional conduct, jointly and severally against the Defendants, as allowed by law.

## XI.
## COUNT EIGHT
## ATTORNEYS FEES

121.  Plaintiff incorporates in this Count the facts and conclusions as set out in ¶¶ 1 through 120.

122.  As a result of the breach of the written 2016 Agreement and the anticipatory breach of the written 2016 Agreement, Plaintiff has been required to retain the service of lawyers to prosecute this suit and represent his interest, and Plaintiff has agreed to pay such attorneys a reasonable and necessary fee for such services.

123.  Defendants Aguilar and Booker are liable, jointly and severally, pursuant to Section 38.001, Tex. Civ. P. Rem. Code, including recovery of attorney's fees on a written contract and on all tort claim that is so intertwined with the contract which underlies the cause of action such that the tort action is intrinsically founded on the interpretation of the contract, for all attorneys incurred by Plaintiff that are found by the Court to be reasonable and necessary, including attorney's fees for the trial of this matter, as well as attorney's fees for the successful defense of any favorable judgment on appeal to either the Fifth Circuit Court of Appeals or the United States Supreme Court.

## XII.
## DOCUMENT PRESERVATION NOTICE

124.  Plaintiff re-states, renews, and continues its demand that all documents and discoverable information, as more fully described in the notice previously served and the related-case discovery, be maintained and preserved under penalty of spoliation in the event Defendants, or any one of them, fail and refuse to preserve all documents and discoverable information.

## XIII.
## ALL CONDITIONS PRECEDENT HAVE BEEN SATISFIED OR WAIVED
## BY DEFENDANTS

125.     All conditions precedent have been fully satisfied as necessary to the bringing of this suit or alternatively, such conditions precedent have been waived.

## XV.
## JURY DEMAND

126.     Plaintiff demands a jury trial.

## PRAYER

WHEREFORE, Plaintiff prays for judgment, jointly and severally, against Defendants as set out and limited above, for:

a.     All actual, special, consequential and expectancy and forfeiture damages resulting from the breach of fiduciary duties, breach of the special relationship duties, fraud, breach of the oral and written Agreements (including the 2016 Agreement) and the duties that arose therefrom, including alternatively recovery for money had and received and promissory estoppel damages; and

b.     Alternatively to the Breach of Contact claims, to recover jointly and severally against Defendants Aguilar and Booker for Promissory Estoppel or Money Had and Received; and

c.     Conditioned upon a finding of a fiduciary or special relationship, an accounting of all of the business transactions of Defendant-Colt regarding its operations, accounting and opportunities, including opportunities taken from Colt and given to Total Tank; and

d.     For all exemplary damages set for the above; and

e.     For pre-judgment interest at the highest rate allowed by law;

f.      For all attorney's fees and expenses for trial and for all appeals;

g.      For all costs of court and for post-judgment interest at the legal rate under

Texas law; and

h.      for such other and further relief, legal and equitable as this Court deems just

and fair.

Dated:   July 17, 2020

Respectfully submitted,

By:     /s/ Shelby A. Jordan
        Shelby A. Jordan
        Texas State Bar # 11016700
        **JORDAN HOLZER & ORTIZ, P.C.**
        500 N. Shoreline Blvd, Suite 900
        Corpus Christi, Texas 78401
        (361) 884-5678   (Phone)
        (361) 888-5555   (Fax)
        sjordan@jhwclaw.com
        **ATTORNEY FOR ROBERT LISERIO**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2020, a true and correct copy of the foregoing document was sent via electronic mail to all counsel listed below and parties listed on the Court's ECF filing system.

Kyle C. Watson
Jenna C. Castleman
2122 N. Main Avenue
San Antonio, TX 78212
Email: watson@goodelaw.com
        castleman@goodelaw.com

/s/ Shelby A. Jordan
        Shelby A. Jordan

# EXHIBIT "A"

December 29, 2016

I Roy E Aguilar, acknowledge that Robert Liserio and his assigns or heirs is entitled to twenty-five percent (25%) of all distribution from Colt Oilfield Services LLC. The benefactor will also be entitled to twenty-five percent (25%) of the net proceeds upon sale of said company.

Notary Republic

Roy E Aguilar

LAUREN WELLS
Notary Public
STATE OF TEXAS
My Comm. Exp. 04/09/2019
ID# 126068397